UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN C. ECKERT,

                          Plaintiff,

            -v-

THE CITY OF NEW YORK,

                          Defendant.

19 Civ. 2825 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

        This is a personal injury action by an officer of the New York Police Department's

("NYPD") Harbor Unit who hurt his back while pulling a dead body from the East River onto a

launch boat.  Plaintiff Steven C. Eckert ("Eckert") brings a negligence claim under the Jones Act,

46 U.S.C. § 30104, and an unseaworthiness claim under general maritime law against the City of

New York (the "City").  Eckert's Jones Act claim asserts that a dangerous condition existed

aboard the boat, the "Launch 622," including because the City had not installed equipment that

would have limited the strain on his back as he retrieved the body and had not adequately trained

him to do so.  Eckert's unseaworthiness claim similarly contends that the boat was not

reasonably fit for its intended service and that he was inadequately trained.

        With discovery complete, the City now moves for summary judgment.  It argues that

Eckert has failed to raise a triable issue of fact under either claim because there is insufficient

evidence that (1) the boat was defective or (2) the boat's condition proximately caused his injury.

The Court denies these motions, finding material disputes of fact on each point.  The Court,

however, grants the City's unopposed motion for summary judgment on a third claim that Eckert

brought but now abandons, for maintenance and cure.

I.      **Background**

A.      **Factual Background**[1]

On November 3, 2016, Eckert was part of a three-man crew (the "Crew") on Launch 622 of the NYPD Harbor Unit.  Joint 56.1 ¶ 3. Consistent with the Harbor Unit's mission, Eckert's usual responsibilities included patrolling the waterfront, counterterrorism, and rescue operations, *i.e.*, retrieving swimmers in distress, persons aboard disabled or crashed vessels, and bodies of persons who jumped off high points such as bridges.  *See* Grasso Dep. Tr. at 31–32; Eckert Dep. Tr. at 11–12; Dein Aff. ¶ 7.  The NYPD Harbor Unit maintains logs that categorize and detail its rescue missions.  *See* Grasso Dep. Tr. at 32–38.  Eckert attests that, on an 8-hour shift, a crew commonly responded to six or seven rescue calls.  Eckert Dep. Tr. at 12.

Launch 622, a 62-foot-long rescue boat, was equipped with a pike pole (or pipe pole), chains, a swim platform, a stokes basket, two rescue wells, and a davit.  Joint 56.1 ¶¶ 20–21; Pl. 56.1 ¶ 40; Def. Resp. 56.1 ¶ 40; Wiker Supp. Rep. at 2 fig. 1, 6 fig. 2, 13 fig. 9, 23 fig. 18.  A

---

[1] The Court draws its account of the facts from the parties' submissions on summary judgment, including their joint Rule 56.1 statement, Dkt. 50 ("Joint 56.1").  The Court has also considered Eckert's Rule 56.1 statement, Dkt. 55 ("Pl. 56.1"); the City's Rule 56.1 statement, Dkt. 54 ("Def. 56.1"); the City's response to Eckert's Rule 56.1 statement, Dkt. 59 ("Def. Resp. 56.1"); the exhibits submitted in support of the City's summary judgment motion, including the expert report and affidavit of Richard Dein, Dkt. 53-4 ("Dein Rep."), Dkt 53-5 ("Dein Aff."), the expert report of Thomas Guldner, Dkt. 53-6 ("Guldner Rep."), and the expert reports of Dr. Steven Wiker, Dkts. 53-7 ("Wiker Rep."), 53-8 ("Wiker Supp. Rep."); and the exhibits submitted in support of Eckert's opposition to the motion, including the deposition transcripts of Eckert, Dkt. 57-1 ("Eckert Dep. Tr."), Lt. Joe Grasso, Dkt. 57-2 ("Grasso Dep. Tr."), and Adam Gonzalez, Dkt. 57-3 ("Gonzalez Dep. Tr.").

Eckert has further moved this Court to deny the City's motion for summary judgment because the City, in adopting the joint Rule 56.1 statement, allegedly failed to file its own Rule 56.1 statement.  Dkt. 56 ("Opp'n") at 3 n.3.  The Court denies that motion, as a party that adopts a joint Rule 56.1 statement does not so fail.  In any event, even if it were, the Court would exercise its "discretion . . . to overlook the failure," *United States v. Abady*, No. 03 Civ. 1683 (SHS), 2004 WL 444081, at *2 (S.D.N.Y. Mar. 11, 2004), in light of the City's response to Eckert's Rule 56.1 statement further clarifying the City's position on the facts of the case, *see* Def. Resp. 56.1.

pike pole is a 6- to 10-foot pole with hooks at its tip used to grasp floating objects, including bodies, and bring them close to the boat.  *See* Dein Rep. at 3 fig. 3; Eckert Dep. Tr. at 26.  Chains serve a similar purpose.  *See* Guldner Rep. at 10 fig. 3.  The swim platform on Launch 622 was an 80 by 29-inch metal plate in the rear (or stern) that could be unfolded and lowered to water level.  Wiker Supp. Rep. at 21 fig. 17.  The lowered swim platform was accessible through two doors that created a 63-inch opening.  *Id.* at 19 fig. 15.  A stokes basket is a human-sized plastic basket that can be used to retrieve floating bodies.  *See* Guldner Rep. at 15 fig. 12.  The parties dispute whether Crew members were trained for its use, but agree that it was not used on the night of November 3, 2016.  Pl. 56.1 ¶ 40; Def. Resp. 56.1 ¶ 40.  A rescue well is a cavity on the boat's side at water level, to assist in the retrieval of persons in the water.  Wiker Supp. Rep. at 23 fig. 18.  The parties dispute whether the rescue well was usable on November 3, 2016, *see* Pl. 56.1 ¶ 31; Def. Resp. 56.1 ¶ 31, but agree that it was not used that night, *see* Joint 56.1 ¶¶ 14–16.  A davit is a small crane.  Wiker Supp. Rep. at 6 fig. 2, 11 fig. 7.

Launch 622 was not equipped with a Jason's cradle.  Joint 56.1 ¶ 22.  A Jason's cradle is, in essence, a strong plastic net, Guldner Rep. at 15 fig. 11.  It is lifted from the water by human force, a davit, or other onboard devices.  *See* Guldner Rep. at 13–15 figs. 7–8, 10–12.

At approximately 8 p.m. on November 3, 2016, the Crew was notified of a 911 call that a person had jumped off the Throgs Neck Bridge into the East River.  Joint 56.1 ¶¶ 6–8.  The Crew arrived at the location at approximately 8:30 p.m.  After a 20-minute search, the Crew spotted the jumper's floating body.  *Id.* ¶¶ 9–11.  While police officer Joe Catuosco ("Catuosco") piloted the boat, Eckert and police officer Adam Gonzalez ("Gonzalez") together attempted to bring the body aboard.  *Id.* ¶¶ 4–5, 13–14.  Eckert and Gonzalez first used the pike pole to bring the body closer to the boat while Gonzalez opened the stern doors and lowered the swim platform.  *Id.* ¶

15. Eckert and Gonzalez then pulled the body onto the platform and onto the boat together. *See id.* ¶¶ 14–17.[2] The body was male and had no clothing except pants. The jumper was already dead when loaded onto the boat. *See* Eckert Dep. Tr. at 24 ("We believed him to be [deceased], yes."); *id.* at 38 (Eckert taking victim's pulse after retrieval and detecting none); Gonzalez Dep. Tr. at 28 (referring to body as "dead on arrival"); *id.* at 34 ("I believe it was a male.").[3]

Eckert attested that this effort took several attempts due to the body's weight and waves rocking the boat, and that he had to bend over while standing with one leg on the swim platform and the other inside the boat. Pl. 56.1 ¶¶ 17, 19–20. The parties agree that, during the rescue efforts, Eckert began to complain of back pain. Joint 56.1 ¶ 16. According to Eckert, this pain ran from his middle to his lower back. Eckert Dep. Tr. at 30. Because the body had not been fully brought onto the boat, Eckert kept laboring in pain for an estimated additional five to six minutes. *Id.* at 34–35. The Crew offloaded the body at Fort Schuyler in the Bronx—an effort in which Eckert could not participate because his pain had intensified, *id.* at 36–37—and returned the boat to Base Adam, Queens, Joint 56.1 ¶¶ 17–18. From there, an ambulance took Eckert to Booth Hospital for emergency treatment. *Id.* ¶ 19; Eckert Dep. Tr. at 42.

Shortly after his release from the hospital, an orthopedist examined Eckert and found two herniated discs, a bulging disc, and impinged nerves. Eckert Dep. Tr. at 48–49. Eckert received six months of physical therapy, pain medications, and epidural injections to manage his pain. *Id.*

---

[2] This method of bringing the body close to the boat with a pike pole and then lifting it onto the boat by physical force is called "snatch and grab." *See* Dein Rep. at 9.

[3] The record does not specify the body's weight. *See* Gonzalez Dep. Tr. at 41 ("[O]nce a person's in the water and they are wet, they are heavy regardless if they weigh 100 pounds or 300 pounds."). *See also* Pl. 56.1 ¶ 35 ("[P]laintiff estimated the weight of the dead body to be between 200 and 250 pounds."). The jumper had arrived on Throgs Neck Bridge by car. Eckert Dep. Tr. at 23.

at 49–52.  When none of those measures relieved his abiding pain, Eckert received a

laminectomy—a surgical procedure removing bone material pinching nerves in the spinal

region—in August 2017.  *Id.* at 52–54.  This, too, failed to alleviate Eckert's pain.  *Id.* at 53–54.

As of his deposition on December 18, 2019, Eckert's physician was considering recommending a

spinal implant.  *Id.* at 54.  At the NYPD Harbor Unit, Eckert returned to non-exertive desk jobs,

*id.* at 59–60, until his retirement in 2018, *id.* at 10.

### B.     Procedural Background

On March 29, 2019, Eckert filed the Complaint.  Dkt. 1 ("Compl.").  It brought a

negligence claim under the Jones Act, an unseaworthiness claim under general maritime law, and

a claim for maintenance and cure for Eckert's medical expenses.[4]  On April 22, 2019, the City

filed an Answer.  Dkt. 7.  On July 9, 2019, the Court held an initial conference and, on July 10,

2019, approved a case management plan.  Dkt. 14.  Numerous extensions of fact and expert

discovery followed, including due to the pandemic; expert discovery closed on April 13, 2021.

*See* Dkts. 17, 21, 24, 33, 39, 42, 44, 47.  On April 21, 2021, the Court held a conference and set a

briefing schedule for the City's anticipated motion for summary judgment.  Dkt. 49.

On May 12, 2021, the parties filed a Joint 56.1 statement.  Dkt. 50.  On June 4, 2021, the

City filed its motion for summary judgment, memorandum of law, a proposed statement of

undisputed facts, and supporting declarations and exhibits, including the report of its expert,

Richard Dein.  Dkt. 51.[5]  On June 25, 2021, Eckert filed his opposition to the City's summary

judgment motion, a proposed statement of undisputed facts, and supporting declarations and

---

[4] Eckert requests $5 million in combined damages for his Jones Act and unseaworthiness claim.
Compl. ¶ 8.  This prayer for relief survives the withdrawal of his maintenance and cure claim.

[5] Because of electronic filing difficulties, the motion and proposed statement of undisputed facts
were not properly docketed until June 14, 2021.  Dkts. 52–54.

exhibits, including the reports of his experts, Thomas Guldner and Dr. Steven Wiker.  Dkts. 55–57.  On July 9, 2021, the City filed a reply ("Reply").  Dkt. 58.

### C.     The Parties' Expert Reports

Central to the City's motion for summary judgment are the parties' expert opinions.  The Court therefore summarizes them in detail.

#### 1.     The Guldner Report

Eckert's first expert is Thomas Guldner, a former lieutenant with the New York City Fire Department ("FDNY") with longtime experience as an officer in charge of the FDNY's fire and rescue boats.  Guldner Rep. at 2.  He is a participating member of the Society of Naval Architects and Marine Engineers' panels on fishing vessel operations and safety, and on small working vessel operations and safety.  *Id.*  He is also a principal member of the National Fire Protection Association's Technical Committee on Merchant Vessels.  *Id.*  Guldner has published articles and spoken at conferences on rescue boat operations.  *Id.*  He worked as a consultant for the FDNY on the design of two of its recent rescue boats.  *Id.* at 2–3.

Guldner's report sets out the NYPD's current standard procedures for retrieving bodies: first, a single officer is to grasp the body with the pike pole and bring it close to the boat; second, two officers were to wrap recovery chains around the body and lift it onto the swim platform.  *Id.* at 3.  Due to rough weather the night of November 3, 2016, Eckert and Gonzalez did not use the recovery chains, but rather pulled the body aboard using their hands.  Issues that obstructed Eckert's mission, Guldner opines, were that (1) Eckert, pike pole in hand, had to awkwardly step around the davit while maneuvering the body to the stern; (2) the dead body was stripped down to its pants, which made it difficult to grasp it with the pike pole; (3) the stern doors' opening

was too narrow for two officers to pull in a body together; and (4) waves caused the officers to at least twice drop the body and have to lift the body anew. *Id.* at 3–4.

Guldner's report opines that there were several deficiencies on Launch 622 "relating to the cause of [Eckert's] injury," *id.* at 4—chief among them the boat's obsolete equipment. Guldner states that more modern devices such as a stokes basket, Jason's cradle, or sling could and should have been used with the onboard davit. *Id.* at 4–5. A fulcrum device, which relies on mechanical application of torque to lift items and bodies out of the water, could have been installed at the stern. *Id.* at 5, 15 fig. 12. The NYPD, Guldner states, must have known of those devices, because other rescue fleets such as the New York Waterway ferries, commercial boats, and at least one FDNY boat have used them "for many years and from many vessels in New York harbor during rescue operations." *Id.* at 5. He opines that the NYPD Harbor Unit, one of whose missions is to retrieve live and dead bodies from the water, and which spends "millions of dollars" on each boat it acquires, should have invested in those "adequate and affordable" tools (*e.g.*, a Jason's cradle costs approximately $2,000). *Id.* at 5–6. Had Launch 622 been equipped with any of these devices, Guldner opines, Eckert's injuries could have been avoided. *Id.* at 6.

Guldner identifies three other factors that contributed to Eckert's injury. First, he states, the Crew received incorrect training for the mission. Although crews were trained to place rescued bodies on the lowered swim platform, the NYPD's manual instructed officers not to operate the boat while the platform was lowered. *Id.* at 4. Second, there was inadequate staffing and supervision. Because the Crew consisted of three, not four, members and because the pilot was occupied monitoring the helm, the retrieval by the other two occurred out of the pilot's sight and supervision. *Id.* Third, the area around the swim platform was insufficiently lit. *Id.*

7

### 2.      The Wiker Report and Supplemental Report

Eckert's second expert is Dr. Steven Wiker.  He holds a Ph.D. and an M.S. in industrial and operations engineering from the University of Michigan, an M.S. in Biological Sciences with a focus in physiology from George Washington University, and a B.S. in Physiology with a minor in Physics from the University of California, Davis.  Dkt. 57-5 at 10.  His graduate education focused on ergonomics, biomechanics, human factors, safety engineering, and computer, mathematical, and statistical modeling, with a special focus on safety engineering, hazard assessment, risk modeling, accident reconstruction, and health hazard prevention.  *Id.* ¶ 3. From 1976 to 1980, Dr. Wiker served on active duty in the United States Coast Guard, first as a line officer navigating ships, patrol boats, and rescue boats, and later as a principal investigator and program manager in its Office for Research and Development, conducting and overseeing research in ergonomics and human factors engineering.  *Id.* ¶ 4; *id.* Ex. 1 at 5.  Before retiring from academia, Dr. Wiker was on the faculty of the Universities of Washington, West Virginia, and Wisconsin; has been an editor or reviewer for 11 professional journals, and has served on 12 professional societies or national consensus committees.  Wiker Rep. at 4; Wiker Decl. Ex. 1 at 8.  He has published textbooks and more than 100 manuscripts and technical reports, and obtained more than $25 million in research funding.  Wiker Rep. at 4–5; Wiker Decl. ¶¶ 7–8.  He has assisted in accident reconstructions and investigations for police, state, and federal investigation units, and consulted on marine vehicle design for the Coast Guard and navies of the United States, Great Britain, and Israel.  Wiker Rep. at 7.

Dr. Wiker's first report, in the main, models an ergonomic analysis of the pressures on Eckert's spine during the November 3, 2016 rescue mission.  Dr. Wiker models those exertions for two scenarios: pulling on the one hand, and simultaneously pulling and lifting on the other.

8

Under assumptions intended to underestimate pressures while exerting that effort, Dr. Wiker calculates that, when handling a body weighing between 150 and 250 pounds, the pressure on Eckert's spine must have exceeded the maximum permissible limit of 1,439 pounds, as set by the National Institute for Occupational Safety and Health ("NIOSH").[6] *Id.* at 12–16.  Depending on the body's weight, the pressure likely exceeded the maximum permissible limit by approximately 20 to 200 pounds.  *See id.* at 15.  Dr. Wiker calculates that, when simultaneously pulling and lifting of such a body, the excess pressure rose to approximately 500 to 1,100 pounds.  *See id.*  Based on these calculations, Dr. Wiker concludes that Eckert's task "was unsafe by [f]ederal [s]tandards" and guidance, and that Launch 622 was deficiently designed for safe body recovery.  *Id.* at 16.

Dr. Wiker's first report opines that several other oversights that made Eckert's task unsafe.  First, the NYPD failed to conduct a job hazard or job safety analysis.  Had it done so, he opines, it would have recognized this danger and likely implemented International Standards Organization ("ISO")- and Occupational Safety and Health Administration ("OSHA")-compliant hazard control protocols, under which Eckert would not have had to perform the unsafe body retrieval procedure.  *Id.* at 16–17.  Rescue vessels were acquired and outfitted based instead on senior police officers' personal opinions.  *Id.* at 19.  Second, he opines, because the record does not contain a formal training syllabus or reveal the content of on the job training, he is unaware of any training provided to the crew as to means of reducing the risk of lower back injury during body retrieval.  *Id.* at 17.  Third, he opines, given the extent of pressure that retrieving the body placed on Eckert's spine, the NYPD's own procedure of tasking two Crew members to pull a

---

[6] NIOSH is a "subcomponent[] of the Department of Health and Human Services."  *Osen LLC v. United States Cent. Command*, 969 F.3d 102, 117 (2d Cir. 2020) (Menashi, J., concurring).

body out of the water was "unacceptable." "Only engineering [hazard] controls would be acceptable." *Id.* He notes, finally, that even after the injury, the NYPD did not investigate why Eckert was injured or analyze the safety of the procedures used. *Id.*

Dr. Wiker's second report, reflecting an inspection of Launch 622 that occurred after his first report,[7] affirmed the first report's conclusions, while identifying other ways in which Launch 622 was defectively designed. Specifically, Dr. Wiker faulted (1) the davit's placement on the boat's port side, which forced Eckert to hold the pike pole at an awkward angle as he maneuvered the body toward the stern, Wiker Supp. Rep. at 10–13, 16; (2) asymmetrically rising and falling, unsecured steps near the rescue well, which created a falling hazard, *id.* at 12–17, 27–31; (3) a stowage box cramping the space in the stern area, which forced Eckert to pull the body at an angle that put more pressure on his spine, *id.* at 17–21; (4) several "'knife-like' flanges and shafts" on the swim platform and in the stern area, which created an impaling hazard if the boat unexpectedly swerved or bobbed during a rescue effort, *id.* at 18–19, 26; (5) the swim platform's small size and the boat's inability to make speed with a lowered swim platform, which required Crew members to further exert themselves by pulling the body into the stern area, *id.* at 22–24; (6) the narrow opening created by the stern doors, which made it hard for two officers to work in tandem and further concentrated spinal pressure on Eckert, *id.* at 24–25; (7) the height difference between the swim platform deck and the sill of the stern doors, which required further exertion, *id.* at 25–26; and (8) the rescue well's narrow stairway, which allowed only one crewmember carrying a body to ascend or descend, *id.* at 30. Based on these

---

[7] Due to logistical difficulties arising from the Covid-19 pandemic, the inspection took place via a video call. Eckert's counsel, Andrew Buchsbaum, Esq., was on Launch 622 moving an iPhone, making measurements, and taking pictures as directed by Dr. Wiker. Wiker Supp. Rep. at 4.

observations and measurements, Dr. Wiker concludes in his supplemental report that "[his] preliminary assumptions . . . were too conservative and that actual stresses [on Eckert's spine] would be greater" than described in the initial report.  *Id.* at 34.  Dr. Wiker's second report states that his earlier estimates of spinal pressure caused by pulling a body without lifting should be disregarded as inapplicable, and that the proper estimate of spinal pressure for pulling and lifting should be between 1,617 to 3,102 pounds.  *Id.* at 34–37.  As in his earlier report, Dr. Wiker opines that Eckert's injuries were "predictable and preventable."  *Id.* at 40.

### 3.    The Dein Report

The City's expert, Richard Dein, is a Coast Guard search and rescue officer with decades of experience in conducting search and rescue missions, and 10 years' experience as the Program Manager of Coast Guard standard rescue boats.  Dein Aff. ¶ 2.  He has supervised the design and operational test and evaluation plan for the Coast Guard's 47-foot life boat, which underwent "severe human factors testing" for more than two years.  *Id.*  Dein has observed or participated in hundreds of in-water personnel recoveries using the snatch-and-grab technique, *id.* ¶ 3, and has authored numerous operations and rescue manuals for search and rescue boats, Dein Rep. at 21.

Dein's report opines that the "snatch-and-grab" method is time-tested and adequate.  *Id.* at 9–10, 13–14.  It is, Dein opines, the fastest and most efficient method of rescue, as it is the only one that does not require the body first to be inserted into a rescue device.  *Id.* at 9.  Using more involved mechanical equipment would prolong a rescue body's time in cold water and lead to more lives lost.  *Id.* at 13–14.  Dein disagrees with Guldner that modern equipment such as a Jason's cradle could feasibly have been installed on Launch 622, because it likely would have displaced other equipment.  *Id.*  Nor would a Jason's cradle likely have prevented Eckert's injury, Dein states, because bringing a body aboard using the device would still require manual

force.  *Id.* at 14.  As such, Launch 622 was fit for its intended purpose, making theories of more desirable equipment irrelevant.  *Id.* at 16.

Dein addresses the remaining points in Guldner's report.  He opines that (1) the Crew's training was adequate in requiring rescued bodies to be placed on the swim platform, because the boat could be operated in that condition, *id.* at 11–12; (2) staffing was adequate, because a supervisor is needed only when working conditions are unsafe—which the City disputes, *id.* at 11; and (3) Guldner has not explained his basis for concluding that the lighting of Launch 622's stern area was inadequate, *id.* at 13.

Because his report predated Dr. Wiker's reports, Dein does not directly respond to Dr. Wiker.  But Dein's supporting affidavit, submitted in support of the City's summary judgment motions, tracks the City's arguments in its summary judgment motion.  He notes that (1) no federal statute, regulation, or guidance (including OSHA's), or industry standard legally required the NYPD to equip Launch 622 with devices other than those it carried, Dein Aff. ¶¶ 8–10; and (2) Dr. Wiker's opinion that a Job Safety Analysis would have led the NYPD to eliminate the conditions that caused Eckert's injury is "specious," undeveloped, and ignores that additional rescue equipment would interfere with the boat's primary function of supporting law enforcement and security missions, *id.* ¶ 11.

## II.   Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the burden of proving the absence of a question of material fact.  In making this

determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Summary judgment is not favored in cases involving materially conflicting expert reports." *Solorio v. Asplundh Tree Expert Co.*, 402 F. Supp. 2d 490, 497 (S.D.N.Y. 2005) (citing *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002)); *see also Quiles v. City of New York*, 978 F. Supp. 2d 374, 385 (S.D.N.Y. 2013) (holding the same in resolving Jones Act and unseaworthiness claims).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

In moving for summary judgment against Eckert's Jones Act and unseaworthiness claims, the City makes two arguments. First, it argues, Eckert has not mustered sufficient

evidence that Launch 622 was in a dangerous condition or unseaworthy.  Second, it argues, Eckert has not adduced evidence that any such condition proximately caused his injury.  In so arguing, the City asks that Eckert's expert reports opining in his favor on these points be disregarded as speculative and nonprobative.

For the reasons that follow, material disputes of fact prevent entry of summary judgment for the City on either claim.  Most important, the Court rejects the City's premise that, to find a dangerous condition or unseaworthiness, Eckert must show a violation of a statutory or regulatory safety standard.  Instead, the Court holds, the evidence Eckert has adduced—largely in the form of expert opinions—would give a trier of fact a basis on which to so find.  The Court also finds sufficient evidence to reach a trier of fact that the City's lapses described by Eckert's experts—including the failure to outfit Launch 622 with certain rescue equipment—proximately caused him to suffer severe back injuries while retrieving the dead body from the East River.  However, the Court grants the City's unopposed motion on Eckert's maintenance and cure claim.

### A.  Jones Act Claim

#### 1.  Applicable Legal Framework

Under the Jones Act, "[a] seaman injured in the course of employment . . . may elect to bring a civil action . . . against the employer."  46 U.S.C. § 30104.  "A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer."  *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001).

Under the Jones Act, the shipowner has a "distinct duty" to "provide a reasonably safe workplace."  *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir. 1991) (citation omitted).  To prevail under the Act, a plaintiff must show "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have

reasonably anticipated the plaintiff might be injured by it; and (3) that [the shipowner's] negligence proximately caused the plaintiff's injuries." *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.*, 805 F.2d 55, 58 (2d Cir. 1986) (internal quotation marks and citation omitted); *see also Martinez v. City of New York*, 684 F. App'x 90, 92 (2d Cir. 2017) (summary order).

Because "the right of the jury to pass upon the question of fault and causation must be most liberally viewed" in a Jones Act claim, *Oxley*, 923 F.2d at 25 (citation omitted), a plaintiff has "a lighter burden for establishing negligence than her counterpart on land would have." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 45 (2d Cir. 2004) (cleaned up).  Courts in this District have termed this standard "featherweight."  *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 178 (S.D.N.Y. 2013), *amended*, 996 F. Supp. 2d 221 (S.D.N.Y. 2013); *Scoran v. Overseas Shipholding Grp., Inc.*, 703 F. Supp. 2d 437, 446 (S.D.N.Y. 2010); *Golden v. City of New York*, No. 14 Civ. 2229 (AJP) (LAK), 2015 WL 2237540, at *3 (S.D.N.Y. May 14, 2015), *objections overruled*, 2015 WL 4510439 (S.D.N.Y. July 24, 2015).  A defendant moving for dismissal on summary judgment must show "an absence of evidence that could 'justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury.'"  *Wills*, 379 F.3d at 50 (quoting *Diebold*, 805 F.2d 55, 57–58 (2d Cir. 1986)) (emphasis in original).

As relevant here, negligence under the Jones Act can be shown where an employer (1) requires that an employee "do his job in a dangerous manner when other safer methods were available," *Stein v. Cnty. of Nassau*, 417 F. Supp. 3d 191, 201–02 (E.D.N.Y. 2019) (quoting *Diebold*, 805 F.2d at 58), (2) requires that an employee "use equipment that is not reasonably fit for the safe performance of the task at hand," *id.*, or (3) provides "inadequate training and safety

procedures," *In re Moran Towing Corp.*, 984 F. Supp. 2d at 178–79.  A trier of fact may

"accept[] or reject[]" non-mandatory authorities "as proof of negligence."  *Jones v. Spentonbush-*

*Red Star Co.*, 155 F.3d 587, 595 (2d Cir. 1998); *Soliman v. Maersk Line Ltd.*, 235 F. Supp. 3d

410, 420 (E.D.N.Y. 2017).  Eligible authorities include industry customs and practices.  *See*

*Berretta v. Tug Vivian Roehrig, LLC*, 259 F. App'x 343, 344–45 (2d Cir. 2007) (summary order)

(citing cases); *Golden v. OSG Ship Mgmt., Inc.*, 14 Civ. 6636 (CRK), 2017 WL 11454726, at *5

(S.D.N.Y. Oct. 12, 2017).  A jury may find negligence where the employer adhered to a widely

accepted industry practice if it "unduly lagged in the adoption of new and available devices."

*See, e.g.*, *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1156–57 (2d Cir. 1978)

(quoting *T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932), *cert. denied sub nom. E. Transp. Co. v. N.*

*Barge Corp.*, 282 U.S. 662 (1932)) (further citations omitted).

### 2.   Sufficiency of the Evidence of Each Element

#### a.   Dangerous Condition

The City argues that Eckert has not adduced sufficient evidence that a dangerous

condition existed on Launch 622, on the ground that there is no competent evidence that the boat

was defective.  Def. Mem. at 6, 10–13.  Eckert's expert witnesses, as noted, have opined that

given its rescue responsibilities, Launch 622 should have been equipped with, and used, a

Jason's cradle, stokes basket, or a fulcrum device, and that this deficiency caused Eckert's injury.

But this, the City argues, is irrelevant, because there is no positive law—no statute or

regulation—that required the boat to have such equipment.  *Id.* at 11.  The City argues that the

experts' views that "the City should have provided more desirable equipment," *id.* at 12, cannot

support liability absent a breach of a freestanding statutory or regulatory obligation.

16

This argument runs aground, because it is premised on a myopic view of the Jones Act element of a dangerous condition.  The City has not identified, and the Court has not found, case authority that to establish a dangerous condition, a plaintiff *must* identify a statutory or regulatory mandate that the ship's equipment breaches.  Quite the contrary, as set out above, custom and practice are also available bases for establishing a duty.  And courts in this Circuit have repeatedly held that Jones Act claims of a dangerous condition may move forward—and prevail—by relying on other proof, including of breaches of industry custom and practice.  *See, e.g.*, *Berretta*, 259 F. App'x at 344–45 ("[No] authority cited by Berretta or discovered in our research[] holds that a trial court errs in considering any evidence of industry standards, customs, or practices to determine what constitutes maritime negligence. . . . On the contrary, we have affirmed district court decisions adjudicating maritime negligence claims in reliance, at least in part, upon such evidence.") (affirming district court's admission and consideration of industry standards as evidence in bench trial) (citing *Espinoza v. U.S. Lines, Inc.*, 444 F. Supp. 405, 407 (S.D.N.Y. 1978), *aff'd*, 586 F.2d 832 (2d Cir. 1978)); *Spentonbush-Red Star Co.*, 155 F.3d at 595–96 (affirming admission of non-mandatory OSHA regulation as evidence of negligence in Jones Act claim at trial); *Soliman*, 235 F. Supp. 3d at 420 ("[N]on-mandatory authorities [are admissible] evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence." (citation omitted)).  None of these authorities suggest that establishing a statutory or regulatory violation is necessary to prove a dangerous condition under the Jones Act.

The City cites several state-court tort decisions to the effect that a breach of industry standards cannot alone establish negligence or that a condition inherently was dangerous or a

product defective.  Def. Mem. at 15–16.  But those cases do not involve Jones Act claims.[8]
Federal courts have asserted their "authori[ty] to develop a federal common of torts respecting
claims brought pursuant to . . . the Jones Act."  *Lyons v. Rienzi & Sons, Inc.*, 863 F. Supp. 2d
213, 226 (E.D.N.Y. 2012), *on reconsideration in part*, No. 09 Civ. 4253, 2012 WL 1339442
(E.D.N.Y. Apr. 17, 2012).  *See also King v. City of New York*, No. 06 Civ. 6516 (SAS), 2007
WL 1711769, at *1 (S.D.N.Y. June 13, 2007) (referring to negligence cases arising out of the
Jones Act as "governed by federal law") (citations omitted).  In exercising that authority, the
Jones Act case law has recognized a plaintiff's "lighter burden for establishing negligence than
her counterpart on land would have," *Wills*, 379 F.3d at 45, and a jury's correspondingly broad
latitude to "pass upon the question of fault," *Oxley*, 923 F.2d at 25.  Jones Act cases have thus
sustained negligence verdicts even where the finding that a boat's condition fell short of industry
norms was not based on a statutory or regulatory violation.

Measured against the proper broader legal standard, Eckert's evidence is sufficient to
reach a jury on his Jones Act claim.

As to Eckert's claim of a dangerous condition, Eckert's experts attest to three ways in
which the boat's condition was dangerous for a person, such as Eckert, tasked with retrieving a
lifeless body from the water.

*The "snatch-and-grab" technique*:  Dr. Wiker opines that, based on biomechanical
analyses and modeling, the use of the snatch-and-grab method to retrieve the body, without
equipment to supply back support, can exert too much pressure on a person's spine to be safe,

---

[8] The City also cites *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839 (D.C. Cir. 2007).
That case, too, is inapposite because it interprets District of Columbia tort law and does not
involve a Jones Act claim.

and that such happened here.  *See* Wiker Rep. at 12.  Guldner, in turn, opines that more modern

equipment for body retrieval—such as a Jason's cradle and/or a stokes basket—could and should

have been used to relieve the strain from lifting a body by brute force alone.  Guldner Rep. at 4–

5.  Such equipment, he opines, was "adequate and affordable," *id.* at 6, and already in use on

"commercial boats," the "New Yo[rk] Waterway ferries," and at least one FDNY boat, *id.* at 5.

Such expert opinions will be proper for the jury in this case to consider, in determining

whether the City required Eckert to "do his job in a dangerous manner when other safer methods

[were] readily available," *Stein*, 417 F. Supp. 3d at 201–02; *see also Pedersen v. Diesel Tankers,*

*Ira S. Bushey, Inc.*, 280 F. Supp. 421, 424 (S.D.N.Y. 1967) (holding that captain negligently

created a dangerous condition where he knew that the type of lines used in a docking procedure

"was not the type of line to be used"); *Belle v. Waterman Steamship Corp.*, No. 95 Civ. 3765

(JFK), 1998 WL 9386, at *5–6 (S.D.N.Y. Jan. 13, 1998) (denying defendant's motion for

summary judgment, and finding triable issue of dangerous condition, where plaintiff had

sustained back injuries after being instructed to carry two 25 pound boxes at once).

To be sure, the City has competing evidence on this point.  This includes the testimony of

its expert, Richard Dein.  Dein opines that the "snatch-and-grab" method and equipment used by

Eckert on Launch 622 has been used by the NYPD to rescue floating bodies "for decades," and

conforms to Coast Guard's safety standards.  *See* Dein Rep. at 9, 16; Def. Mem. at 9–13; Reply

at 6–7.  A finder of fact could find for the City based on such proof.  But under the Jones Act

precedents above, it is for the finder of fact to assess whether the "snatch-and-grab" method as

deployed in the night in question breached a standard of care so as to give rise to a dangerous

condition.  *Soliman*, 235 F. Supp. 3d at 420.  *See also In re City of New York*, 475 F. Supp. 2d

235 (E.D.N.Y. 2007) (bench trial decision discussing industry custom in determining

negligence), *aff'd*, 522 F.3d 279 (2d Cir. 2008); *Oxley*, 923 F.2d at 25.  It is for the jury here to

weigh and resolve the conflict between the "materially conflicting expert reports," *Solorio*, 402

F. Supp. 2d at 497, and to decide whether the NYPD Harbor Unit "unduly lagged in the adoption

of new and available devices."  *Tug Ocean Prince, Inc.*, 584 F.2d at 1156–57.

  ***Design defects impeding recovery***:  Guldner opines that using recovery chains to lift a

body from the water did not account for the narrow opening between the stern doors.  This, he

explains, made it effectively impossible for two officers to work together.  Also complicating

Eckert's work, Guldner opines, the placement of the lifeboat on Launch 622 blocked the light

from the upper deck that should have illuminated the rescue area.  Guldner Rep. at 4.  For his

part, Dr. Wiker opines that the davit's onboard location interfered with Eckert's use of the pike

pole while pulling the body towards the boat; that a storage box cramped the rescue area space,

forcing Eckert to lift the body awkwardly, adding strain to his spine; and that a badly designed

rescue well required the Crew to resort to the snatch-and-grab method in the first place.  Wiker

Supp. Rep. at 5–28.  A jury may credit these expert conclusions.  They raise a triable issue

whether the onboard equipment was "not reasonably fit for the safe performance of the task at

hand."  *Stein*, 417 F. Supp. 3d at 201–02; *see Juliussen v. Buchanan Marine, L.P.*, No. 08 Civ.

1463 (DCP), 2010 WL 86936, at *10 (S.D.N.Y. Jan. 7, 2010) (finding triable issue whether a

stair was reasonably safe for use where plaintiff adduced evidence that a slip hazard arose from

insufficient lighting); *Oxley*, 923 F.2d at 25–26 (reversing grant of summary judgment, finding,

in part, triable issue as to existence of a dangerous condition on ground that onboard lighting was

insufficient and the ship lacked a gangplank for entering and exiting).

  The City objects that Dr. Wiker's defective design theory, articulated in his supplemental

expert report prejudices it, because it was not specified adequately in Eckert's Complaint.  Def.

Mem. at 12.  That is wrong.  Eckert's cause of action for seaworthiness, Compl. ¶ 6, embodies a design defect theory.  *See Quiles*, 978 F. Supp. 2d at 390 n.7 ("Claiming that a vessel is unseaworthy often is tantamount to claiming that it suffers from a defective design.").  While Dr. Wiker's report, in opining as to defective design, develops that theory, the City cannot claim a lack of notice that Eckert was claiming a defective design.  And the City's expert, Dein, rebutted the claim of design flaws on Launch 622 in his response to Guldner's expert report, which had opined that the boat's equipment was inadequate and outdated.  *See* Dein Rep. at 13–16.  The City at all times was incented to develop, as it has, expert evidence that the design and equipment of Launch 622 conformed to safety standards.  Moreover, Dein's affidavit in support of the City's summary judgment motion explicitly addresses Dr. Wiker's defective design theory.  Dein Aff. ¶¶ 8–11.  And the City's summary judgment motion, drawing upon Dein's report, argues that the boat did not have any design defect.  *See* Def. Mem. at 6, 9–13; Reply at 4–5, 7.  Finally, had the City believed it had more to say in response to Dr. Wiker's supplemental report, it could have sought to extend expert discovery; the Court had liberally extended expert discovery deadlines in the case.  The City did not do so, or claim that it had been prejudiced at any time before expert discovery closed.

*Inadequate staffing and training*:  Guldner opines that the boat was understaffed with no one to supervise the three-person Crew.  Guldner Rep. at 4.  And, he notes, "[t]here was no guidance as to where the body should be placed" once pulled onto the swim platform.  *Id.*  In a similar vein, Dr. Wiker opines that "[t]here was no syllabus for formal or on-the-job training," so as to prevent low back or other injuries.  Wiker Rep. at 14.  He notes, too, that the rescue jobs assigned to Eckert had not been "subjected to a Job Hazard [Analysis] or Job Safety Analysis" that could have revealed their potential for injury to the rescuers.  *Id.* at 16–17.

Measured against Jones Act standards, these expert opinions provide a sufficient basis on which the jury could find a breach of standard of care causing injury. *See In re Moran Towing Corp.*, 984 F. Supp. 2d at 178–79 (sustaining Jones Act negligence claim based on theory that defendant provided "inadequate training and safety procedures"); *Soliman*, 235 F. Supp. 3d at 419 (finding, after bench trial, breach of duty under Jones Act where the shipowner "fail[ed] to conduct a risk assessment of its garbage disposal procedures and failing train its crew in safe pulling techniques").

The City counters that Dr. Wiker's opinion that the City was obliged to conduct a job safety analysis is baseless. Def. Mem. at 12–13. But Eckert has mustered enough for this theory of duty to reach the jury. Dr. Wiker cites support for his conclusion: hazard protocols by the ISO and by OSHA, and a safety professionals handbook. Wiker Rep. at 13. The City will be at liberty at trial to develop the argument that these authorities are inapposite. *See* Def. Mem. at 15–16; Dkt. 53-9. But on the summary judgment record, which must be viewed in the light most favorable to the non-movant, *Holcomb*, 521 F.3d at 132, this dispute is for the jury to resolve at trial based on what the Court expects will be a full explication of these competing positions.

More broadly, the City impugns Eckert's expert reports as speculative and non-probative. Def. Mem. at 6, 12–15. To the extent the City suggests that the anticipated testimony would be inadmissible under Federal Rule of Evidence 702, however, the City forewent the opportunity to move to exclude this testimony as inadmissible under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). *Daubert* motions are commonly made alongside summary judgment motions, where an adversary's case depends on evidence that a party contends is inadmissible under Rule 702. But the City, in challenging Eckert's expert testimony, does not cite any rule of evidence or

caselaw, including Rule 702 and *Daubert*.[9]  Instead, the Court is left with "materially conflicting expert reports," none of which has been challenged as inadmissible and each of which on its face supports the proponent's case.  In this situation, "[s]ummary judgment is not favored."  *Solorio*, 402 F. Supp. 2d at 497.  *See Quiles*, 978 F. Supp. 2d at 385 (declining to exclude expert report in Jones Act action where City had failed to "interpose[] a *Daubert* challenge; plaintiff's testimony and expert report "plainly suffice[d] to create a material factual issue as to whether the City negligently created a [dangerous] condition"); *Maldonado v. Hapag-Lloyd Ships, Ltd.*, No. 09 Civ. 18 (MDG), 2015 WL 1966344, at *7 (E.D.N.Y. May 1, 2015) ("Given the conflicting expert and lay expert opinions and defendants' reliance on their expert without raising a *Daubert* challenge to any of plaintiffs' evidence, summary judgment is not appropriate here.").

Eckert has adduced sufficient evidence to raise a triable issue of fact on the element of a dangerous condition.  *Diebold*, 805 F.2d at 58; *Stein*, 417 F. Supp. 3d at 201–02; *In re Moran Towing Corp.*, 984 F. Supp. 2d at 178.

### b.    Notice

The City does not dispute the sufficiency of Eckert's evidence that it was, or should have been, on notice of the conditions he terms dangerous—and for good reason.  Eckert testified in his deposition that "[w]e always asked why we didn't have any equipment."  Pl. 56.1 ¶ 46 (quoting Eckert Dep. Tr. at 71).  He attests that, before the incident, he had asked his superiors why, as early as "back in 2008 or 2010," boats by the New York Waterway were equipped with "cargo net[s]," "and here we are [at the NYPD] using chains with nylon rope to maneuver

---

[9] *Big Apple Tire, Inc. v. Telesector Res. Grp., Inc.*, 476 F. Supp. 2d 314 (S.D.N.Y. 2007) (cited at Def. Mem. at 14) does not concern the admissibility of expert testimony, under *Daubert* or otherwise.

bodies." *Id.* (quoting Eckert Dep. Tr. at 71).  *See Soliman*, 235 F. Supp. 3d at 420 ("Ship owners

must guard against identified dangers.").

Eckert points to other evidence circumstantially supporting that the City should have

known of dangerous conditions.  This includes that the City did not perform a job safety analysis,

and that, in discovery, it was unable to produce any records "in any way related to the suggested

design, equipment, or installation of equipment to assist in water rescue or recovery of deceased

individuals from the water prior to the construction of Launch 622 and sister launches."  Pl. 56.1

¶ 47 (quoting Dkt. 57 ("Buchsbaum Decl."), Ex. 6) (noting City's production of no records in

response to demand for "[a]ny and all questionnaires, notes, memoranda or other writings

maintained by defendant in any way related to" the above); *see also* Grasso Dep. Tr. at 50–51,

54–55 (plaintiff's counsel stating that such a request had been made in discovery, not been

complied with at the time, and twice reiterating the request).  On this assembled evidence, a

reasonable jury viewing the evidence in the light most favorable to Eckert could find that the

City did nothing in response to his complaints about Launch 622, including the lack of safety

equipment to assist in the recovery of bodies from waterways.

### c.     Proximate Causation

The City disputes that either of Eckert's expert witnesses attests that the deficiencies they

describe proximately caused his lower back injuries.  It argues that Guldner does not state

"within a reasonable degree of maritime certainty" that Launch 622's assertedly inadequate

staffing, supervision, training, and lighting proximately caused those injuries.  Def. Mem. at 11.

It argues that Dr. Wiker's assertion that the lack of a Job Safety Analysis caused those injuries is

speculative, *id.* at 12, and that his supplemental report does not connect the assertedly deficient

design of the areas around the davit and the rescue wells' stairs to these injuries either, *id.* at 14.

At the threshold, the City does not cite authority that, to establish liability under the Jones Act, proximate causation must be shown "reasonable degree of maritime certainty." Instead, the familiar preponderance of the evidence standard applies. *In re Moran Towing Corp.*, 984 F. Supp. 2d at 178. A plaintiff at summary judgment must merely establish by a preponderance that "negligence played any part, even the slightest, in producing the injury." *Id.* (citing *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)).

Eckert's proof is sufficient for a jury to so find. It is undisputed that Eckert complained of back pain as he used his arms and back to lift the waterlogged dead body from the water onto the boat, and that he was taken by ambulance to the hospital immediately after the mission ended. Joint 56.1 ¶¶ 16–18. That would enable a jury to find that Eckert's lifting of the body proximately caused his injury. And the experts testify that deficiencies aboard the boat brought about those injuries. Guldner clusters the equipment and training deficiencies he describes as "[i]ssues *relating to* the cause of [Eckert's] injury." Guldner Rep. at 4 (emphasis added). And it is logical why these would make it more likely that a person left to lift a lifeless body from the water with brute force could hurt his back.

Dr. Wiker's supplemental report also coherently links the boat's equipment deficiencies to Eckert's injury. The assembled evidence cogently develops that the missing equipment, and the inability to use the rescue wells, compelled Eckert to resort to the snatch-and-grab method, which in turn placed excess strain on his back; and that the deficiently placed davit, narrow stern doors, and awkwardly placed stowage box forced Eckert to move the body at angles that put additional pressures on his back. Wiker Rep. at 10–13; Wiker Supp. Rep. at 5–6, 12–34. This proof is sufficient to empower the jury "to pass upon the question of . . . causation." *Oxley*, 923 F.2d at 25; *see also Soliman*, 235 F. Supp. 3d at 415, 420 (seaman had raised triable issue of fact

on proximate causation solely by adducing evidence of failure to train in how to safely pull garbage bags, despite having received training on how to lift them).

There are, however, two exceptions.  Dr. Wiker opined that the unsecured stairs around the rescue wells created a falling hazard when a rescuing officer is navigating a floating body with a pike pole, Wiker Supp. Rep. at 12–17, and that "'knife-like' flanges and shafts" on the swim platform and in the stern area created an impaling hazard, *id.* at 18–19, 26.  Those observations, however, are unconnected in the report to Eckert's injury, as Dr. Wiker all but concedes.  *See id.* at 16 ("While the[] hazards [related to the stairwell] did not directly result in the injury in this case . . .").  The Court cannot find any record evidence, direct or circumstantial, that these two conditions "played any part, *even the slightest*, in producing the injury," *Wills*, 379 F.2d at 50.

Dr. Wiker's other theories, however, are sufficient to reach the jury.  The Court accordingly denies the City's summary judgment motion on Eckert's Jones Act claim.

### B.      Unseaworthiness Claim Under General Maritime Law

#### 1.      Applicable Legal Framework

Under general maritime law, a shipowner "has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service." *Oxley*, 923 F.2d at 24–25.  "The standard is not perfection, but reasonable fitness." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *see also Martinez*, 684 F. App'x at 92 ("Seaworthiness does not demand an accident-free ship, only one reasonably fit to be at sea." (citing *Lewis*, 531 U.S. at 441)).  "[T]he meaning of seaworthiness is relative and varies with the vessel involved and the use for which the vessel is intended." *Atl. Specialty Ins. Co. v. Coastal Envtl. Grp. Inc.*, 945 F.3d 53, 68 (2d Cir. 2019) (citations and internal quotation marks omitted).

Unlike a Jones Act claim, unseaworthiness triggers "liability without fault" and "depends neither on negligence nor on notice." *Oxley*, 923 F.2d at 25 (cleaned up) (citing *Martinez v. United States*, 705 F.2d 658, 660 (2d Cir. 1983)) (further citations omitted); *see also Barlas v. United States*, 279 F. Supp. 2d 201, 206 (S.D.N.Y. 2003) ("The law of unseaworthiness has been described as a species of 'strict liability' or even a 'no fault doctrine.'" (citation omitted)). Plaintiff must show "by a preponderance of the evidence that the ship, its equipment or crew, was unseaworthy," *Barlow v. Liberty Mar. Corp.*, No. 08 Civ. 4436 (VVP), 2012 WL 12957416, at *7 (E.D.N.Y. Dec. 26, 2012), *aff'd*, 746 F.3d 518 (2d Cir. 2014) (citing *In re Marine Sulphur Queen*, 460 F.2d 89, 99 (2d Cir. 1972)), and that the unseaworthy condition proximately caused plaintiff's injuries, *see Oxley*, 923 F.2d at 26; *Saleh v. United States*, 849 F. Supp. 886, 894–95 (S.D.N.Y. 1994); *Stein*, 417 F. Supp. 3d at 198–99.

Although the legal standards in Jones Act and unseaworthiness claims differ, they often "depend in large part upon the same evidence." *Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 18 (1963). A ship is unseaworthy when it is "insufficiently or defectively equipped." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726 (1967) (footnote omitted). Similarly, "[t]he number of men assigned to perform a shipboard task might be insufficient" or "[t]he method of loading her cargo . . . might be improper." *Stein*, 417 F. Supp. 3d at 199 (quoting *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971)). Separately, "a vessel being operated by an incompetent . . . crew is considered unseaworthy." *In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009). Incompetence as a basis for unseaworthiness occurs where injured crewmembers "are not trained for the specific task . . . at issue" and are thus not trained "to perform it safely." *Marasa v. Atl. Sounding Co., Inc.*, 557 F. App'x 14, 18 (2d Cir. 2014) (summary order); *see also Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 697

(S.D.N.Y. 2008).  "For any of these reasons, or others, a vessel might not be reasonably fit for her intended service."  *Usner*, 400 U.S. at 499.

"District courts in this circuit are divided" on "what level of causation is required for unseaworthiness claims."  *Juliussen*, 2010 WL 86936, at *11 (collecting cases).  While *Milos v. Sea–Land Serv., Inc.* ruled that causation requires the same low showing as under Jones Act claims, 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979), courts have since consistently required that (1) "the unseaworthiness played a substantial part in bringing about or actually causing the injury" and (2) "the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  *Saleh*, 849 F. Supp. at 895; *see also Juliussen*, 2010 WL 86936, at *11 (applying *Saleh* standard); *Lisowski v. Reinauer Transp. Co.*, No. 03 Civ. 5396 (NGG), 2009 WL 763602, at *13–14 (E.D.N.Y. Mar. 23, 2009) (same); *Sadler v. Moran Towing Corp.*, 204 F. Supp. 2d 695, 697 (S.D.N.Y. 2002) (same); *Nasser v. CSX Lines, LLC*, 191 F. Supp. 2d 307, 315 (E.D.N.Y. 2002) (same); *Brown v. OMI Corp.*, 863 F. Supp. 169, 170 (S.D.N.Y. 1994) (same).  Accordingly, "the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy."  *Golden v. City of New York*, 2015 WL 2237540, at *6 (quoting *Mosley v. Cia. Mar. Adra, S.A.*, 314 F.2d 223, 229 (2d Cir. 1963), *cert. denied*, 375 U.S. 835 (1963) (further citations omitted)).

### 2.    Sufficiency of the Evidence of Each Element

#### a.    Reasonable Fitness

The City's arguments that Eckert cannot establish that Launch 622 was not "reasonably fit for [its] intended use," Def. Mem. at 17 (citing *Mitchell*, 362 U.S. at 550), largely track its arguments under the Jones Act.  It notes that Eckert has not identified a statute or regulation

28

obligating the City to include the additional equipment in question.  And it argues that Eckert has not shown that Launch 622 or the equipment that was present on November 3, 2016 "was not reasonably fit for its intended use."  *Id.* at 16–17.

As a basis for summary judgment, these arguments do not carry water.  The City again does not cite authority that a finding of insufficient or defective equipment can be shown only by a violation of a statutory or regulatory standard.  Quite the contrary, courts in this Circuit have long held that a ship can be found unseaworthy for want of insufficiently or defective equipment even where no such standard had been violated.  *See, e.g.*, *T.J. Hooper*, 60 F.2d at 739–40 (without a statute on point, finding barge unseaworthy for failing to have radio onboard despite widespread industry practice of not equipping one), *Afran Transp. Co. v. The Bergechief*, 274 F.2d 469, 474 (2d Cir. 1960) (finding vessel unseaworthy for not equipping a radar device, even though "no statute or regulation require[d] it").  Courts instead have widely relied upon custom and practice evidence in evaluating the sufficiency of the proof supporting unseaworthiness claims.  *See, e.g.*, *Di Salvo v. Cunard Steamship Co.*, 171 F. Supp. 813, 815–16 (S.D.N.Y. 1959) (trial court heard testimony on "customary and usual practices, principles and procedures and methods with respect to putting out baggage chutes," where liability turned on whether jury found chutes to be ship's "equipment"); *Barlas v. United States*, 279 F. Supp. 2d 201, 209 (S.D.N.Y. 2003) (Chin, J.) ("[A]t the commencement of a voyage, the ship shall be furnished with all the necessary and *customary* requisites for navigation, or, as the term is, shall be found seaworthy." (citation omitted) (emphasis added)); *Quiles*, 978 F. Supp. 2d at 386–87 (finding triable issue of fact on whether vessel was seaworthy where non-movant's expert opined that, "had the City complied with standard industry custom and practice," plaintiff would not have been injured).

With this anchor of its argument removed, the City's summary judgment challenge to Eckert's proof of unseaworthiness collapses—substantially for the same reasons as its challenge to his Jones Act proof. A plaintiff may prove a ship's unseaworthiness—a lack of reasonable fitness for its intended use—by a variety of showings, *Usner*, 400 U.S. at 499, including that the ship's equipment worked deficiently or was insufficient, *Waldron*, 386 U.S. at 726. Eckert's evidence, which supports multiple theories as to why Launch 622 was unfit for the job of removing a dead body from the water, clears this bar.

First, as noted, Guldner attests to multiple deficiencies in Launch 622's onboard equipment, most importantly its lack of a sling, fulcrum device, or a Jason's cradle, which is used by the FDNY and New York Waterway ferries. Guldner Rep. at 5. He opines that a Jason's cradle could have been used to pull bodies from the water with the onboard davit, or that a fulcrum device could have been used from the swim platform, either of which would have limited or avoided the use of human exertion altogether. *Id.* at 4–5. Second, Dr. Wiker opines that, had the City has performed its mandatory Job Safety Analysis of the boat, it would have found its equipment inadequate for body retrieval. Wiker Rep. at 13–14. Third, Dr. Wiker opines that, had the rescue wells not been defective, Eckert would not have had to resort to the snatch-and-grab approach. Wiker Supp. Rep. at 22. And fourth, he opines that the davit's starboard side placement, the narrow opening of the stern doors onto the swim platform, and the placement of the stowage box near those doors were further design flaws that made the boat's equipment defective. *Id.* at 10–11, 12–34.

Although the jury might or might not be persuaded by this proof, expert testimony along these lines raises a triable issue whether Launch 622 was defectively equipped for its mission on

the night in question, and thus unseaworthy.[10]  *See, e.g.*, *Marasa*, 557 F. App'x at 18 (affirming finding that crew "was not trained for the specific task of anchor-handling here at issue"); *In re Moran Towing Corp.*, 984 F. Supp. 2d at 175–76 (finding unseaworthiness where shipowner failed to train crew to "safely perform a swing maneuver, operate the capstan or handle towlines"); *T.J. Hooper*, 60 F.2d at 739–40 (finding unseaworthiness where lack of more modern devices presented unreasonable safety risk); *Juliussen*, 2010 WL 86936, at *10 (finding triable issue of fact on unseaworthiness where defective lighting created an injury hazard).

### b.     Proximate Causation

Tracking its argument under the Jones Act, the City also argues that Eckert has failed to adduce sufficient evidence of proximate causation.  Def. Mem. at 18.  The City casts Eckert as merely stating that different equipment would have been preferable, and as arguing from "the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties," that Launch 622 was unseaworthy.  *Golden v. City of New York*, 2015 WL 2237540, at *6.  It casts Eckert as asserting a "nonexistent duty to provide an accident free ship."  Def. Mem. at 18.

That argument fails because it presents a false caricature of Eckert's claim and of the evidence Eckert marshals in support.  Eckert solidly links his evidence of the boat's unseaworthy condition with his injury.  His back injury undisputedly occurred while lifting a body from the

---

[10] The City does not address other critiques by Eckert's experts which could also be mustered in support of such a finding.  Guldner, for example, concludes that Launch 622 was inadequately staffed on the night of the incident because it carried three rather than four officers, Guldner Rep. at 4, supplying a basis on which to find that "[t]he number of men assigned to perform [the rescue] task might [have been] insufficient," *Usner*, 400 U.S. at 499.  And Dr. Wiker, as noted, contends that the Crew was inadequately trained how to lift bodies out of the water, *see* Wiker Rep. at 14, supplying a basis on which to find that the personnel at issue were "not trained for the specific task . . . at issue," *Marasa*, 557 F. App'x at 18.

water with his hands.  His experts opine that had different equipment been aboard and/or had the rescue wells been usable, he would not have had to exert himself in this way.  *See* Guldner Rep. at 4–5; Wiker Supp. Rep. at 22.  They further opine that had (1) Eckert and his crewmates been properly trained, (2) there been a wider opening through which to drag the body aboard, or (3) there been more space for Eckert to stand in while dragging in the body, the pressures on his spine—and the risk of his injury—would have been lower.  Guldner Rep. at 4; Wiker Rep. at 14; Wiker Supp. Rep. at 12–34.  This is a sufficient basis on which a jury could find that Launch 622's unseaworthiness—if found—"played a substantial part in bringing about or actually causing the injury" and identify the injury as "a direct result or a reasonably probable consequence of the unseaworthiness."  *Saleh*, 849 F. Supp. at 895;[11] *see also In re Moran Towing Corp.*, 984 F. Supp. 2d at 176 (finding proximate causation where injury occurred in course of performing task for which crew had not been adequately trained); *Juliussen*, 2010 WL 86936, at *11 (injury from slip in an inadequately lit area raised triable issue on proximate causation).

The Court accordingly denies the City summary judgment on Eckert's unseaworthiness claim.

---

[11] *Saleh*, on which the City relies, is inapposite.  The City notes that the court there discounted, as evidence of proximate causation, a treating physician's "statement [] that the alleged defect was a competent producing cause of plaintiff's back injury."  *See* Def. Mem. at 18 (citing *Saleh*, 849 F. Supp. at 894–95).  But in *Saleh*, there was no expert report addressing causation of the injury; the treating physician was not qualified as an expert.  And whereas Eckert immediately complained of his injury, Saleh did not notify his employer of his injury until more than a month after the alleged accident.  *Saleh*, 849 F. Supp. at 892.  The determination in *Saleh* that there was insufficient proof of a causal link between the accident (falling down a ladder) and the alleged unseaworthy condition, *id.* at 895, does not dictate the outcome here, where Eckert complained of sudden back pain during his retrieval of the body aboard the boat, and where two experts have linked that injury to the boat's alleged unseaworthy condition.

### C.      Maintenance and Cure Claim

Eckert initially brought a third claim, for maintenance and cure.  A seaman "injured while serving the ship" is entitled to "three dist[in]ct remedies—maintenance, cure, and wages." *Messier v. Bouchard Transp.*, 688 F.3d 78, 81 (2d Cir. 2012), *as amended* (Aug. 15, 2012) (quoting *Lewis*, 531 U.S. at 441) (citing *Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 315–16 (2d Cir. 1990)).  "'Maintenance' compensates the injured seaman for food and lodging expenses during his medical treatment.  'Cure' refers to the reasonable medical expenses incurred in the treatment of the seaman's condition.  And lost wages are provided in addition to maintenance."  *Id.* (quotation marks and citations omitted).  These duties apply "no matter what the cause, and liability extends for a fair and reasonable time after the voyage to effect improvement in the seaman's condition."  *Unterberg v. Mobil Shipping & Transp. Co.*, No. 14 Civ. 10025 (GBD), 2017 WL 4326040, at *5 (S.D.N.Y. Sept. 20, 2017) (quoting *Koslusky v. United States*, 208 F.2d 957, 959 (2d Cir. 1953)).

Eckert has withdrawn his maintenance and cure claim on the grounds that he has already obtained this relief.  Opp'n at 21.  The Court therefore grants the City's motion for summary judgment on that claim as unopposed.

### CONCLUSION

For the foregoing reasons, the Court principally denies the City's motion for summary judgment, except insofar as the Court grants the City's unopposed motion for summary judgment on Eckert's maintenance and cure claim.  The Clerk of Court is respectfully directed to terminate the motion pending at docket 52.

This case will now proceed to trial.  The parties are directed to submit a joint pretrial order consistent with the Court's individual rules, along with all other filings required by those

rules, by **January 31, 2022**.  Upon review of the joint pretrial order, the Court will schedule a conference to, *inter alia*, resolve any motions *in limine* that have been made and discuss the setting of a prompt trial date.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: January 11, 2022
         New York, New York